The next case is ParkerVision v. Qualcomm, 2022-1755. Mr. Budwin. May it please the Court, Josh Budwin on behalf of ParkerVision. During my initial introduction, I'd like to address two issues, the collateral estoppel and the Dalbert issues. First, collateral estoppel cannot apply in this case as a matter of law because the patent claims and infringement issues in this case relate to switch-down conversion and are exactly the opposite of the prior case that related to capacitor-down conversion. Second, the District Court abused its discretion in striking the whole of our infringement expert report without finding that Qualcomm's own highly confidential documents and the testimony of the engineers who designed the circuits in question and that were relied on by our expert were unreliable. Let me ask you with respect to the distinction between switches and capacitor. We're talking about claim, say, 23 in the 551 patent and claims in the 940 patent.  Yes, Your Honor. If we look to claim 23 of the 551 patent, and this is at pages star, 1011 to 12 of the ParkerVision 1 opinion, the last elements of that claim recite, a storage module recited to said switch module, wherein said storage module receives non-negligible amounts of energy transferred from a carrier signal, and then the very end of that claim there's another wherein clause, wherein a lower frequency signal is generated from the transferred energy. Consistent with that claim language, this Court held in ParkerVision 1 that the claims asserted in that case, including claim 23 of the 551 patent, required the capacitor, the energy storage element, to perform down conversion. In contrast, if we look to claim 24 of the 940 patent at issue here, this is at appendix 150, this claim has three parts, and they're labeled 1, 2, and 3. One, a universal frequency translation module. That's the switches. Said UFT module aliasing, sampling, opening and closing a switch, an electromagnetic signal, according to an aliasing signal, having an aliasing rate to down convert said electromagnetic signal and transferring energy that's already been down converted at an aliasing rate. And then if we look to item 3, it's a storage device storing energy from the UFT module. The language of the claims makes plain, and it tracks the holding of this Court's decision in ParkerVision 1, that in the prior case, the capacitors were required to down convert, and in this case, the switches are required to down convert. Of course, this is summary judgment, isn't it? Yes, Your Honor, it is summary judgment of collateral estoppel, which is an issue of law which this Court should review de novo. The comparison of claim scope that you just went through, is it fair to think of that as a question of law itself, that's really analogous, if not identical, to claim construction? Yes, Your Honor, I believe it is. This Court can look at the language of the claims itself as a matter of law, and this Court can determine that the scope of those claims are different. Now, my understanding is nobody asked the District Court to do claim construction as part of this collateral estoppel analysis, isn't that right? That's correct, Your Honor. The District Court was not asked to construe by either party any of the claims at issue in this case to read in a generating limitation that would bring the scope of the claims, the literal language of the claims at issue in this case, to read on the same scope as the claims that were at issue in the prior cases. But isn't that a problem for you? Because couldn't we see your appeal as essentially asking us to do claim construction that you never asked the District Court to do? No, Your Honor. The language of the claims as written controls, in the absence of a claim construction, we look to the plain and ordinary meaning of those claims, and the plain and ordinary meaning of those claims, as I just discussed with Judge Lurie, the language is different. The language is different as a matter of law. You can see that by looking at the claims. You don't need a claim construction to do that. If anything, if Qualcomm was trying to import limitations to make these claims look like the claims from the prior case, then they should have advanced a claim construction asking for the claim scope to be the same, and they didn't. So if anything, the issue would seem to imply a waiver on Qualcomm's part and not on our part. The language of the claims as written is consistent with our infringement theory and shows that the issues to be litigated in this case are not the same as the issues litigated in the prior case. The District Court was of the view that your experts admitted that the claim scope was basically identical here to what we faced in Parker vision 1. For example, at A8, the District Court says your experts admitted that the claims here require that you produce a lower frequency signal using energy that's been transferred from a higher frequency signal into a storage medium. Did I get right what the District Court found, and didn't your experts in fact admit that? You did get right what the District Court found, and the District Court did correctly quote our expert. But the expert's testimony is fully consistent with switchdown conversion, which is the issue litigated in this case, and not capacitor down conversion, which was the issue litigated in the prior case. The question that was asked, and I have this. It's reproduced on page 26 of Qualcomm's brief. The question that was asked was, does Claim 24 of the 940 patent require that you produce a lower frequency signal using energy that's been transferred from a higher frequency signal into a storage medium? If we look at Claim 24 of the 940 patent, as I just discussed with Judge Lurie, you can see the way that claim is set up, the UFT module, the switch, down converts. To down convert said electromagnetic signal and transferring energy from said electromagnetic signal at an aliasing rate. And where does at least some of that energy get transferred? It gets transferred into a storage device. The switches have already down converted that energy by the language of the claim, and our expert's opinion, which I'll provide for you, Your Honor, before they reach the energy storage device. So the expert's alleged admission that Qualcomm relies upon on page 26 and that the district court relied upon in granting collateral estoppel summary judgment is fully consistent with the infringement theory in this case, which is the opposite of the infringement theory at issue in the prior case. If we look to Appendix 44111 and 4334, these are... 444111? Two 4s, three 1s, 40334. These are excerpts from our expert's report where he is crystal clear that it is the switches that are doing the down conversion. And as related to the quote that Your Honor asked me about and that we just discussed, this is page 4334. During the periodic coupling, so when the switch is closed, a down converted signal exists at the output of the mixer. I'm quoting our expert's report. It consists of two parts, one that goes to the load and the other that goes to the energy storage device. That's the infringement opinion. The switches down convert. That down converted energy then goes to two places. It goes to the load and some of it goes into the energy storage device. The quote that Your Honor asked me about that's reproduced on page 26 is 100% consistent with that theory of infringement, which was not an issue that was litigated in the prior case. And the report that you just quoted for, was that part of the summary judgment record on the collateral estoppel summary judgment motion, the second one, the one that was granted? Yes, Your Honor, it was. And the district court just overlooked it is your view? That's my view. And I think the district court also got it wrong as a matter of law by treating this issue as a disputed issue of material fact between the experts. The claim language itself is clear. That's all that we need to look at. Even to the extent that we get to what the experts had to say, I just explained to Your Honor why our opinion is consistent with the switch down conversion theories presented here and different from the prior case. But it's important that Qualcomm's expert agrees with us. And we present the testimony of Qualcomm's expert, the excerpts from his report on pages 40 and 41 of our brief. Their expert prepared these side-by-side charts in an attempt to show that the claim language is the same. What those claim language side-by-side charts in fact show is the claim language is different. When we look to that critical generating limitation, we don't see that present in the charts prepared by Qualcomm's expert. And I think it's important to note that we took the court's guidance from the prior case to heart. Star 1013, star 1014, star 1016, this court told us in the prior case that the double balance mixer, that's the switches in Qualcomm's product, creates the baseband signal before the signal reaches the identified capacitors. And this meant, and I'm quoting from 1014, that Qualcomm products obtained the baseband signal from somewhere other than the energy stored in the capacitors, precluding a finding of infringement. Consistent with that, we selected and asserted claims and infringement theories in this case that read on the switches in the double balance mixer doing the down conversion and creating the baseband signal before the capacitors. And because the infringement of patent claims that cover switches generating or creating the baseband signal was not litigated in the prior case, but is being litigated in this case, collateral estoppel cannot apply as a matter of law. That's the sovereign software case. And with that, I'd like to reserve the remainder of my time. We will save it for you. Mr. Gardner. May it please the court. I'm Eamon Gardner on behalf of Qualcomm. The district court in this case did exactly what it was asked to do. For both collateral estoppel and Albert, it received extensive briefing, held two full days of hearings, and issued opinions consistent with the one-sided evidentiary record that was actually presented to it. The decisions should be affirmed. I'd like to start with the issue of collateral estoppel. For collateral estoppel, the court was asked to decide whether a person of ordinary skill in the art would consider the received claims in this case to include the same requirement that the court found dispositive of non-infringement in Parker Vision 1. On this issue, the record was uncontested. The district court properly relied on Dr. Razzavi's undisputed analysis, that's Qualcomm's expert, and the deposition admissions from not one, but both of Parker Vision's experts, confirming that the claims at issue have the same fundamental requirement, and those admissions are cited at the red brief at page 26. Now, Parker Vision has presented bare attorney argument that the claims in this case are somehow different. They're, quote-unquote, switch-down converted. This is an argument which lacks any intrinsic support or relevant extrinsic support and should be rejected. But we can read the claims. Yes. So I do understand that the court can look at the language of the claims, but this is not claims that are sort of layman's terms or claims that are within sort of the ordinary usage. These are very complex sets of patents, and even Parker Vision argued that this is an evidentiary issue to the district court. So, for example, in the records site 10072, Parker Vision argued that in the absence of a claim construction, the jury must decide how a person of ordinary skill in the art would understand it, understand the claim. Now, Parker Vision has attempted to distinguish this, saying they were talking about non-infringement or talking about infringement in their case. But on the very next page, 10073, Parker Vision, for this exact issue, whether or not the 907 claims include the generating requirement, Parker Vision once again argued it was an evidentiary issue. And I'll quote, Parker Vision said, no party sought to construe any term in the 907 patent, so the jury must decide on a trial record how a pasito would understand the claims plain and ordinary meaning. Parker Vision cannot now withhold... You speak in anagrams as well. I apologize. I think that that was a direct quote, to be fair, from the record. But I will try to always use person of ordinary skill in the art. Parker Vision now can't fault the district court for accepting its own argument on how to handle the very issue in dispute. Well, let me press you a little on that. If this is a question of law, of claim scope, analogous to claim construction, don't we have an obligation, either us or on remand the district court, to resolve that dispute as a question of law, even if you all decided it's not a question of law? Well, first, I think the invited error doctrine, which is Logan v. Principe, which was cited in our briefing, says that if the parties present the district court with an argument that this is how you should handle it, that the district court following that, then Parker Vision can't now complain about that on appeal. But second, even if we look at this from a claim construction perspective, claim construction requires that you look at the plain and ordinary meaning or the meaning of the claims through the eyes of a person of ordinary skill in the art. And here we have three experts, both of Parker Vision's experts, who acknowledge that the claims include the same argument. What's your response to the maybe arguably more common sense reading of the claims that we got from your friend on the other side, where it doesn't sound like that generating language is in the claims before us now, which was clearly there in the 551 patent in Parker Vision 1? So I think this court has held that just mere differences in claim language isn't what's important. It's whether or not the same requirement is included, right? So that's the Ohio versus... So where is it included in the claims before us now? Great. So we have in specifically, if we look at the 940 patent, which I think your question relates to, is we're talking about an aliasing module that performs down conversion. And Parker Vision puts a lot of weight on the fact that within the aliasing rate that helps perform that down conversion is included in the UFT module and then ignores that we have a signal generator and a storage device that are also part of the aliasing module in order to perform that down conversion. Now, neither party presented the claim construction dispute on what the aliasing module does because all the experts understood this. I understand that that's not an ordinary term that anybody here uses, but that term is something that was well within the knowledge of a person of ordinary skill in the art. And on deposition and in Dr. Razavi's expert report, all three experts agreed that the aliasing module includes this fundamental requirement. Now, Parker Vision has argued today that the expert admission isn't actually an admission. It's the same. But the language that we're talking about is an exact quote from the Federal Circuit's argument. I mean, the Federal Circuit's decision in Parker Vision 1. So the Federal Circuit in Parker Vision 1 said the generating limitation in each of the asserted claims requires that the accused products produce a low-frequency baseband signal using energy that has been transferred from a high-frequency carrier signal into a storage medium. That's the exact quote that we asked their experts. So for Parker Vision to now stand here and say that that describes switch-down conversion is rather surprising given that that's the exact way that the generating limitation, which was described in PV1, which was the essential finding in PV1, matches that language. So there appears to be no dispute that the generating limitation and their switch-down conversion are exactly the same because they agreed today that that language describes both the generating limitation in Parker Vision 1 and their supposed switch-down conversion, which, again, does not exist in any of these patents that are at issue here. In your brief at page 17, you write that both of Parker Vision's technical experts, there was the original, I think, Dr. Allen, and then a replacement expert. You say both of them testified the asserted received claims from the 940 and the 907. Those are the patents with us. Include the exact requirement that the district court and this court found dispositive of non-infringement in Parker Vision 1. Is the place that you would point to for those two experts admitting that? This quote at page 26, and your other cites at 26 in your brief? That's correct. So the quotes in our red brief at page 26, they also cite to the Parker Vision 1 decision at 1013. So if you compare, this court said that the generating limitation, it said what that requires. We then asked their experts, does it require the same thing? And they confirmed. So we don't have any dispute. All right, so if just hypothetically, if we say those are not admissions or that on a summary judgment standard, a reasonable fact finder could say those are not admissions, it's more complicated, there's a genuine dispute of fact, what would we do at that point? Well, if you found that the previous statements were not admissions? That the statements in this case that the district court relied on to say there's no dispute of fact about claim scope, if we say there is a dispute of fact, what do we do at that point? I think that the issue, I still think that affirmance is proper because what we have is we have Dr. Razavi has submitted an expert report, right? So this was submitted as his opening expert report, and the district court relied on that and at appendix seven, it includes multiple citations to Dr. Razavi's opening expert report, and Park Revision had an opportunity to present rebuttal analysis of that. What happened to Dr. Allen's expert report that the district court relied on in denying your summary judgment motion at the beginning of the case? Wasn't that still part of the record? So that is not part of the record, and that's a great question. I want to be clear about this. So Dr. Allen submitted an expert declaration in 2019 that the court relied on in denying their original summary judgment. When Dr. Allen was replaced, the court issued an order, and that's at appendix 31984 through 31991, and the district court set bounds on what Dr. Stier was allowed to adopt and not allowed to adopt, and at 31984, the order regarding the replacement expert defines that Dr. Allen or Dr. Stier is allowed to adopt the 2020 expert reports with no mention of the expert declaration. At 31991, the court repeats that statement. How could that be proper? There was a report in 2019 from their expert who got sick, by the way, right? You're not alleging there was something nefarious in that expert disappearing, right? Yeah, that's correct. So how can evidence that created a genuine dispute of fact on the very point of the scope of the claims that the district court relied on to deny your first motion suddenly be wiped away, as if it doesn't exist, when you renew your motion years later? Well, I think the fact is that if Dr. Stier would like to adopt that, he would have needed to actually adopt it, and there's no evidence that he actually did. Now, the reason there's nothing on appeal is Park Revision never argued this below. But if they had, there was deposition testimony of Dr. Stier where he says he never looked at the Park Revision 1 claims. How could Dr. Stier have adopted something from a 2019 declaration that compares those? Obviously, he would have had to have done a little bit of work to look at the claim. That's right. He would have needed to do it, but he didn't, so he didn't adopt it. So we're in a situation where they withdrew an expert and they didn't have their replacement expert do the analysis that would be required in order to adopt that. And I think that this ends up going a little bit outside the evidentiary record, but I mean, we would, of course, be happy to submit that to confirm, but there's just simply, it's just simply not true that Dr. Stier adopted that, nor was he allowed to, given the bounds of what the order on the replacement expert covered. I just want to cover briefly because counsel just touched out at a really high level on the Daubert issues, if you don't have any more questions on collateral assault. So on the Daubert issues, Perkovision has just failed to show that that Daubert decision was manifestly erroneous, as is required by the deferential abuse of discretion standard review. Now, I heard Perkovision's counsel say highly confidential documents, that its expert relied on those, and this is a case where we had two full days of hearings on this. They had a full opportunity to identify the documents that their expert relied on and provide evidence that their expert actually relied on those materials, and they just didn't do it. The district court was in a position to be able to consider those arguments, and the fact is, they just never have shown that their expert actually relied on or actually considered those materials. Instead, they point to materials that were never cited by their experts, they point to materials that are irrelevant to the asserted claims, or they point to calculations that just simply don't exist per the district court's findings. So is this argument that even if we thought the district court  in order to make the opinion reliable, that would not lead to reversal because the other problem is their expert didn't rely on anything, much less not do testing. I think that's exactly right. So there's two layers to this. Qualcomm submitted unrebutted evidence, including the textbook from Dr. Allen, the expert who actually prepared the analysis and the report, saying that simulations are customary and necessary, and that an expert must simulate to understand these specific kinds of devices. Now, this isn't sort of a general. The court found that for these specific claims and for these specific products, that simulations were proper and simulations were necessary. Indeed, it considered undisputed evidence that the same experts, when analyzing the same exact products for similar claims, attempted to rely on simulations in other cases. So this was not something that, and that's at Appendix 33, this was not something that was new to them. Now, even if you said, well, we don't need to rely, you don't need to do simulations, then it's still Perkovision's burden to show that their expert relied on sufficient facts and or data, and they just never demonstrated that to the district court. Before your time runs out, there's this other expert report related to invalidity. You say we don't have jurisdiction over that part of their appeal. They talk about the doctrine to avoid judicial waste in their reply brief. If, I know this isn't what you want, but if the case is going back anyway, and if we thought the district court got this invalidity one wrong, to avoid judicial waste, should we say something, or we shouldn't or can't say something about that? Well, I don't think it's properly in front of this court, but it's also not ripe for resolution. If you look at the court's order at Appendix 27 and 45, the district court instructed the parties to go meet and confer on this issue and to submit further briefing if necessary to resolve how the court's order will actually impact. And we have a fundamental disagreement here about the framing of the issue, but our view is that we're relying on the findings that were necessary for the claims that were invalidated, and Park Revision disagrees with that, but we still have just a fundamental... If we affirm, is this case still going forward on invalidity? No, it's not. Okay, thank you. Do you have a final thought? No, Your Honor. All right. We can guess what it is anyway. Mr. Budwin has some rebuttals on. Yes, Your Honor, thank you. So briefly on the collateral estoppel issue, we heard my friend discuss that it was representative of the district court that the jury should decide the issue of collateral estoppel. The jury should decide the issue of claim scope. And while I don't think that's the right standard, as we discussed earlier, here, the jury did not decide that issue, and the district court told us directly that he didn't think juries should be resolving these types of issues. The district court resolved this issue against us at summary judgment, and the district court got it wrong. If the jury must decide this issue using the alleged admission of our expert, they're welcome to cross-examine the expert at trial with that and get whatever testimony from the expert at trial that they think they can make from that cross-examination. This isn't an issue where the expert admitted anything and gave the case away. I think it's very important for us to focus on what the holding of the Parker Vision 1, the prior case, was. My friend is pointing to what I would characterize as loose language in that opinion related to the use of the word produce. It's clear the holding in that case required the capacitors to generate, which is the claim language, or create. And when the prior opinion uses words like produce, it was using them as a synonym for generate or create. There's no evidence that the expert, with respect to the testimony that we've been discussing, was asked that question. He understood produce in that same way. Instead, because at the time he is asked that question, collateral estoppel has already been resolved in our favor by the district court two years before. He's answering that question in the context of the claims and his infringement opinion, both of which are crystal clear that switches down-convert, not the capacitor. I would like to address the Dalbert issues briefly with my remaining time. Before you do, Dr. Stier never adopted Dr. Allen's opinion, and Dr. Allen's opinion on collateral estoppel was not part of the record, according to your friend. Dr. Stier, as I understood it, adopted all of Dr. Allen's opinions when Dr. Allen had to be replaced for his medical issues. Are you able to point us to where in the record we could find support for that? What I have is I actually have the expert declaration that was signed by Dr. Allen. I don't have a record site that says Dr. Stier specifically adopted the expert declaration, which is at Appendix 10-0-9-1, so 1-0-0-9-1-9-2. But at the time of Dr. Stier's expert report and at the time of his deposition, the court had already resolved the collateral estoppel issue. Our view was that issue was resolved in our favor. It was over and done with. And then our expert put in an infringement theory, an infringement report that's clear that the switches down-convert. Because the collateral estoppel issue had already been resolved by the court, we didn't view that as a live issue that required expert testimony to go in and rebut. Even when you got a renewed motion for summary judgment on collateral estoppel? That came after the expert reports, after the record was closed. But you made no effort, apparently. You're nothing you can point to in the record for, oh, by the way, we'd now like to expand the record to make sure Dr. Stier has a chance to adopt. So Dr. Stier is crystal clear time and again in his report that the switches down-convert. There is never one opinion cited in his report anywhere where he says the capacitor down-converts, not one. And so the report itself shows that it's the switches that down-convert, not the capacitors that down-convert. And the report is clear that there's infringement in this case in an issue that is different from the issues presented in the prior case. And turning briefly to the Dalbert issue, I heard my friend suggest that while we had Qualcomm evidence in the record, there's no proof that our expert actually relied on the Qualcomm evidence. And if we look to Appendix 33, and this is the district court, I think it's interesting how the district court framed this issue. He says, this is a quote, the point being that plaintiff's experts elected to rely on Qualcomm's design review documents, testing review documents, schematics, and defendant simulations in conjunction with mathematical analysis to support the opinions. The district court is recognizing that we cited and relied on Qualcomm's evidence. Appendix 39, as to the harmonically rich signal term. The district court found that Parker Vision's expert relied on and cited a low-level, this is a quote, a low-level test, harmonic test, showing a second and third harmonic power level. Expert report cite Appendix 51074. That's the expert explaining the evidence relied upon for the harmonically rich signal. Appendix 38 and 27 for gating. Again, the district court says, Dr. Stier's report contains numerous references to gating, and he identifies switches on schematics which he contends performs the gating function. That's the district court saying that our expert cites evidence in support of gating. Counsel, your time is up. We take the case on the submission. Let me ask you just to make sure everything is working all right. You keep looking over there to see the timing. Is it not in front of you? It is in front of me, but... All right. Yes, thank you, Your Honor. Thank you. The case is submitted.